# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VSEVOLOD GARANIN, et al.      :      Civil No. 3:19-CV-1275
                               :

      Plaintiffs,               :
                               :      (Magistrate Judge Carlson)

           v.                  :
                               :

CITY OF SCRANTON, et al.       :
                               :
      Defendants.            :

## MEMORANDUM OPINION

## I.    Statement of Facts and of the Case

This is the second civil action before us filed by Vsevolod Garanin and his associated entities against the City of Scranton and others. The defendants have now moved to dismiss this lawsuit, or in the alternative, to combine it with Garanin's initial lawsuit, Civ. No. 3:14-cv-2129 ("Garanin I"), also pending before this court, for ease of litigation. After review of these motions, we will grant them both in part. The defendants' motion to dismiss this case shall be granted as to Counts IV and VII, denied as to Counts II, III, and VI, and granted in part and denied in part for Counts I, V, and VIII. Likewise, the defendants' alternative motion to consolidate Garanin's two cases shall be granted in part at this time solely for purposes of global settlement discussions concerning both of Garanin's lawsuits pending before this

court, and we will defer a decision regarding further consolidation of the cases for trial pending the outcome of any mediation efforts.

In the eight-count complaint presently before us, Garanin sets forth several claims under 42 U.S.C. § 1983 for violations of procedural and substantive due process rights, equal protection, the First Amendment, and protections against unreasonable searches and seizures. In addition, the complaint sets forth claims for Monell liability, malicious prosecution, and tortious interference with existing and prospective business and contractual relationships. These allegations are based on the following facts which are derived from the plaintiffs' complaint:

Plaintiff Garanin is a Scranton-area businessman, owning a controlling share in Garanin Properties LLC, the parent company holding Auric Investment Holdings LLC ("Auric"), Ferndrive LLC ("Ferndrive"), and Rock Property Holdings LLC ("Rock Property"), the co-plaintiffs in this case. (Doc. 1, ¶¶ 1-5). These wholly-owned subsidiaries own the properties which give rise to Garanin's disputes in this second complaint, including 300-302 William Street, 126-128 School Street, 614 Willow Street, and 1208-1210 Philo Street. (Id., ¶¶ 3-5). The defendants in this case are William Courtright, the former mayor of the City of Scranton; Patrick Hinton, the former Director of the City of Scranton's Department of Licensing, Inspections, and Permits; Lori Uher, the Officer of Rental Registration for the City's Department of Licensing, Inspections, and Permits; Tamilyn Carmona, a Code Enforcement

Officer for the City's Department of Licensing, Inspections, and Permits; and the City of Scranton. All defendants worked for the City during all pertinent portions of the plaintiffs' complaint.

According to the complaint, the defendants in this case condemned the William Street property, held by Auric, for fear of a roof collapse despite the fact that Auric had contracted to repair and replace the roof on the building pursuant to a City-issued construction permit for same and had removed tenants from the top floor of the two-story building. (Id., ¶¶ 20, 22, 24). Garanin, on behalf of Auric, appealed this condemnation to the City of Scranton Housing Appeals Board. (Id., ¶ 29). After its condemnation, and during the pendency of Auric's appeal, the City also allegedly instructed PPL to remove the four electric meters from the building since it was not being occupied.[1] (Id., ¶ 30). The Board held a hearing on the condemnation on November 29, 2018. (Id., ¶ 31). Thereafter, on December 4, 2018, the Board issued a decision upholding the City's condemnation of the property. (Id., ¶ 32). Garanin promptly appealed this determination to the Lackawanna County Court of Common Pleas; this appeal remains pending as of the date of the filing of this complaint. (Id., ¶¶ 33-34). In the interim, the City fined Auric multiple times for prohibited occupancy and quality of life citations since there was still at least one

---

[1] Contrary to this assumption, Garanin claims that there was at least one tenant residing on the first floor of the building until February 23, 2019. (Id., ¶ 21).

tenant residing in the building, despite the ongoing appeals process, and the City's alleged refusal to remove the tenant from the building.[2] (Id., ¶¶ 40-44). Garanin's attempts to remedy the situation, through Auric, were allegedly frustrated by the City's continual roadblocks, thus delaying and prolonging the reopening of the building. (Id., ¶¶ 45-57). Similarly, Ferndrive's School Street property remained condemned by the City for an extended period of time, despite Garanin's efforts and compliance with all requirements and the defendants' requests. (Id., ¶¶ 58-62).

With respect to Ferndrive's Willow Street property, the City of Scranton's Department of Licensing, Inspections, and Permits allegedly received complaints regarding the heating in the first-floor units. (Id., ¶ 63). Without conducting an inspection to confirm the tenant complaints or providing notice or a hearing to Ferndrive or Garanin, the defendants closed the property due to "unhealthy and hazardous conditions." (Id., ¶¶ 64-65, 71). After a delayed waiting period for a hearing before the City of Scranton Housing Appeals Board to contest the closure, the Board decided to uphold the City's determination as to the property. (Id., ¶¶ 72-76). On June 12, 2019, Ferndrive, via Garanin, filed an appeal of this decision with

---

[2] Garanin alleges that he was unable to remove the tenants from occupancy since the building had been condemned. Thus, "[o]nly law enforcement and / or the CITY itself can remove the tenants of a condemned property if the condemnation order stands." (Doc. 1 ¶ 35).

the Lackawanna County Court of Common Pleas, which remained pending as of the time the plaintiffs' complaint was filed. (Id., ¶¶ 77-78).

Garanin, through Rock Property, lastly alleges that the Philo Street property faced similar issues from the defendant. Specifically, on February 2, 2019, Defendant Carmona condemned a unit in this property after UGI "red tagged the furnace" therein without notice or a hearing provided to either Garanin or Rock Property.[3] (Id., ¶¶ 79, 88). Defendant Carmona did this despite the fact that a city-licensed mechanical and plumbing contractor was allegedly *en route* to the building on the same day. (Id., ¶¶ 86-87). Thereafter, Garanin, on behalf of Rock Property, filed an appeal with the Board. (Id., ¶ 93). While this appeal was pending, Garanin attempted to amicably resolve the problems necessary to reopen this unit by scheduling an inspection with the City. Due to close deadlines with the Board of Appeals hearing, Garanin requested a rescheduling of this inspection from Defendant Hinton, who allegedly refused to allow a rescheduling after Garanin turned down a settlement offer from the City. (Id., ¶¶ 116-24). Garanin was further stymied when, after another delayed hearing before the Board, allegedly due to the defendants' actions, the Board decided to uphold Defendant Carmona's decision to

---

[3] Garanin notes that "it is a fairly common practice for UGI to red tag gas appliances and provide the owner with notice and an opportunity to cure an alleged infraction[,]" and that "by red tagging a furnace[,] any 'immediate health and safety risk' is remedied by UGI instantaneously." (Id., ¶¶ 80-81).

condemn the Philo Street property unit. (Id., ¶¶ 95-97). Rock Property appealed this decision to the Lackawanna County Court of Common Pleas on June 13, 2019, which remained pending at the time the plaintiffs filed their complaint in this case. (Id., ¶ 98).

While the condemnation of this unit in the property was making its way through the appeals process, Rock Property received notice that the entire Philo Street property was out of compliance with the city's rental ordinance and that a rental registration payment was required. (Id., ¶¶ 100-01). Despite Rock Property allegedly submitting this payment and confirming its receipt, Defendant Uher closed the entire property on April 10, 2019 without notice to Rock Property or Garanin on the grounds that the property still had not been registered. (Id., ¶¶ 102-04, 108). A series of appeals followed which were largely reminiscent of the other plaintiffs' experiences with the Board of Appeals; the Board opted to uphold the City's decision on May 16, 2019, and an appeal was pending with the Lackawanna County Court of Common Pleas as of the time this complaint was filed. (Id., ¶¶ 113-14).

Lastly, Garanin generally alleges that he has been the subject of disparate treatment from the defendants. (See id., ¶ 132). As support for this assertion, Garanin claims that:

> Specifically, on June 18, 2019 a permit was denied for the 1930 Bristol Ct. property as owned by the Ethel M. Martinez due to non-payment of rental registration fees. The property was not closed (Exhibit 40).

Once again, on June 19, 2019 a permit was denied for the 722 N. Main Avenue property as owned by the Jewish Discovery Center Inc. due to non-payment of rental registration fees, amongst other reasons. The property was not closed (Exhibit 41).

On the contrary the GARANIN controlled WILLOW STREET PORPERTY [sic] and the PHILO STREET PORPERTY [sic] were closed.

(Id., ¶¶ 133-35) (emphasis in original).

The defendants respond to these factual averments with a motion to dismiss, asserting privileges of qualified immunity and claiming that the plaintiffs have failed to allege sufficient facts to include all named defendants in each count of the complaint. The defendants alternatively move to consolidate the 2014 Garanin I case and the present dispute for ease of litigation.

By way of background, Garanin has already filed a civil lawsuit with this court in 2014 containing a similar factual landscape to the present complaint. Civ. No. 3:14-cv-2129. This 2014 matter is still pending before this court, the case having been stayed pending resolution of criminal charges against Garanin in state court. Garanin I is now set to proceed, fact discovery having concluded, and dispositive motions having been filed. In fact, we have entered a case management order in this case, scheduling it for trial in the Summer of 2020, and directing the parties to notify us if they wish to pursue mediation by January 31, 2020. Thus, the 2014 matter and the case at hand present themselves in distinctly different procedural postures, the instant case having reached only the motion to dismiss stage. Given these differences

in procedural posture, despite the similar factual landscape, we find it appropriate to grant the defendants' alternative motion to consolidate these cases, in part, for purposes of settlement discussions only at this time.

## II. Discussion

### A. Motion to Dismiss—Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no

more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> at 679.

According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678. Rather,

in conducting a review of the adequacy of a complaint, the Supreme Court has

advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than
> conclusions are not entitled to the assumption of truth. While legal
> conclusions can provide the framework of a complaint, they must be
> supported by factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief.

<u>Id.</u> at 679.

Thus, following <u>Twombly</u> and <u>Iqbal</u>, a well-pleaded complaint must contain

more than mere legal labels and conclusions; it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter <u>Iqbal</u>, when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part analysis. First,
> the factual and legal elements of a claim should be separated. The
> District Court must accept all of the complaint's well-pleaded facts as
> true, but may disregard any legal conclusions. Second, a District Court
> must then determine whether the facts alleged in the complaint are
> sufficient to show that the plaintiff has a "plausible claim for relief." In
> other words, a complaint must do more than allege the plaintiff's
> entitlement to relief. A complaint has to "show" such an entitlement
> with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); see also, U.S. Express Lines, Ltd. v. Higgins, 281 F.3d382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

**B.      Qualified Immunity**

Throughout their motion to dismiss, the defendants raise several challenges to the plaintiffs' complaint, including the allegation that they should be discharged from this case on qualified immunity grounds. Recognizing that the Supreme Court has voiced a preference for resolving questions of immunity at the earliest stage of trial, Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L.Ed.2d 589 (1991), but finding that the questions before us involve immutably fact-bound determinations, among other reasons as discussed below, we will deny these portions of the defendants' motion to dismiss without prejudice for the defendants to raise again upon a more fulsome record.

Initially, it is well-settled that:

> "[T]he qualified-immunity defense shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305, 116 S. Ct. 834, 133 L.Ed.2d 773 (1996) (internal quotation marks, brackets, and citations omitted). An essential attribute of qualified immunity is the "entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Mitchell [v. Forsyth], 472 U.S. [511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)]. The immunity is intended to protect officials from the potential consequences of suit, including distraction from official duties, inhibition of discretionary action, and deterrence of able people from public service. Id. "[E]ven such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' " Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 817, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)).

Thomas v. Independence Twp., 463 F.3d 285, 291 (3d Cir. 2006).

Because qualified immunity bestows immunity from suit, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L.Ed.2d 589 (1991). Yet, while questions of qualified immunity should be resolved at the earliest possible stage of the litigation, it is also evident that some qualified immunity questions are fact-specific and require consideration of matters beyond the pleadings. Indeed, in many instances, "crucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996). Given the highly fact-specific nature of certain qualified immunity inquiries, some qualified immunity claims may not be readily amenable to resolution at the outset of a case on a motion to dismiss.

In such instances:

> When presented with a complaint that does not lend itself to an early resolution of the qualified immunity issue, a district court has several options. First, a district court may order the plaintiff to reply to the defendant's answer pleading qualified immunity. Crawford-El [v. Britton], 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)]. Second, a district court may grant a defense motion for a more definite statement under Rule 12(e) with respect to the conduct of which the plaintiff complains. Id. The district court should avail itself of these options before addressing the immunity question, which sometimes

requires complicated analysis of legal issues. Id. If the plaintiff's action survives these hurdles, the plaintiff ordinarily will be entitled to some discovery, but the district court may limit the timing, sequence, frequency, and extent of that discovery under Rule 26. Id. at 598-99. Beyond these procedural tools, summary judgment remains a useful tool for precluding insubstantial claims from proceeding to trial. Id. at 600.

Thomas v. Independence Twp., 463 F.3d at 301.

In our view, two of these options, which lie in our discretion, have only limited utility as a means for clarifying this complaint, which is challenged on qualified immunity grounds. Oftentimes directing a litigant to endeavor to respond to a qualified immunity claim by either requiring the plaintiff to: (1) reply to the defendant's answer pleading qualified immunity; or (2) granting a defense motion for a more definite statement under Rule 12(e) with respect to whether the defendants are entitled to qualified immunity have limited usefulness in addressing this defense. Therefore, in many instances, the most fair and efficient means of addressing qualified immunity issues which are not susceptible to quick resolution on a motion to dismiss may be the third option endorsed by the courts: a prompt, and properly documented, summary judgment motion.

In our view, these principles guide the course which we choose to follow in this case. In this instance, both the plaintiffs' complaint, and the defendants' motion to dismiss on qualified immunity grounds endeavor to characterize the actions and motives of certain named defendants in relation to the plaintiffs' properties. On this

score, the parties' positions reflect a stark and irreconcilable conflict. Garanin views these actions as bad faith, discriminatory and retaliatory actions. The defendants insist that their conduct constituted a prudent response to public health and safety concerns. On the pleadings alone, these disputes regarding motivation cannot be addressed. These accounts present disparate descriptions of the events at issue in the complaint and rely upon facts and evidence outside of the pleadings which we are not in a position to weigh. Thus, we are invited to make a fact-specific determination of qualified immunity in the procedural setting of a motion to dismiss where we are enjoined from looking beyond the pleadings. We will therefore deny the defendants' motion to dismiss on qualified immunity grounds as to all counts in the plaintiffs' complaint without prejudice, subject to a timely motion for summary judgment at a later stage in the proceedings. We will also address other, more pointed issues of qualified immunity raised by the defendants as to the individual counts in the plaintiffs' complaint as they arise below, bearing in mind the fact-bound nature of a qualified immunity defense.

> **B.** **The Defendants' Motion to Dismiss Count I of the Plaintiffs' Complaint for a Violation of the Plaintiffs' Procedural Due Process Rights is Granted in Part and Denied in Part Without Prejudice.**

In Count I of their complaint, the plaintiffs have alleged that the defendants violated their rights to procedural due process guaranteed by the Fourteenth Amendment by condemning properties or units within the plaintiffs' properties

without affording them either notice or a pre-deprivation hearing. The plaintiffs likewise claim that they were issued citations for prohibited occupancy without notice or a hearing. The defendants counter, primarily, that they are entitled to qualified immunity on these procedural due process claims because pre-deprivation notice is not required in cases involving exigent circumstances where a post-deprivation remedy is available to an aggrieved property owner. The defendants further maintain that the record establishes that the prohibited occupancy citations were warranted since there were clearly individuals residing in the condemned properties. Lastly, the defendants assert that the plaintiffs' complaint is over-broad in alleging that all named defendants are liable for conduct which, in the complaint, only mentions some of the named defendants. Thus, these extraneous defendants should be removed from liability for this count in this complaint. We address these claims in the order raised.

It has long been settled law that where a state can feasibly provide a pre-deprivation hearing before taking property, it generally must do so. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 80-84, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (hearing required before issuance of a writ allowing repossession of property). It is also true that in some cases involving exigent circumstances requiring officials to act quickly, a pre-deprivation hearing may be deemed unnecessary and in such cases the existence of a post-deprivation remedy may be adequate to protect a property

owner's due process interests. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982) (" '[T]he necessity of quick action by the State or the impracticality of providing any predeprivation process' " may mean that a post-deprivation remedy is constitutionally adequate) (quoting Parratt v. Taylor, 451 U.S. 527, 539, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981); see also Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (holding that a deprivation of a constitutionally protected property interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 procedural due process claim, unless the state fails to provide an adequate post-deprivation remedy).

There is no question, therefore, that summary administrative enforcement action may be taken in emergency situations. Where competent evidence allows an official to reasonably believe that an emergency exists, discretionary invocation of emergency procedures will only amount to a constitutional violation if the action is arbitrary or an abuse of discretion. Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 418 (3d Cir. 2008). "Where government officials are faced with a decision in which a failure to act quickly could have serious health consequences, perfection or near perfection is not the standard." Id. at 420.

In this case, however, there is a fundamental factual dispute as to whether the defendants reasonably could have believed that an actual emergency existed, since

the plaintiffs maintain that there is no evidence upon which the defendants could have concluded that there was any danger to the life or health of any occupants of their properties. Specifically, with respect to the plaintiffs' William Street, Willow Street, and Philo Street properties, all of which the defendants allegedly condemned due to health and safety concerns, the plaintiffs claim that the alleged "imminent roof collapse" in the William Street property consisted of mere wet ceiling tiles in the first floor unit caused by an oversight from the roofers. Likewise, Garanin alleges that the lack of heat in the Willow Street property was on its way to being addressed on the same day it was closed, and the red-tagged furnace in the Philo Street property posed no immediate danger as soon as UGI labeled it with the red tag. Should the plaintiffs prove these well-pleaded facts, there would no longer be an emergent or exigent circumstance to justify the condemnation of these properties without some form of pre-deprivation process. Therefore, these factual disputes, in addition to our already-established analysis on the issue of qualified immunity at this stage in the proceeding, preclude a finding that the defendants are entitled to qualified immunity on the plaintiffs' procedural due process claims.

We thus move to the plaintiffs' claim that they were issued citations for prohibited occupancy without notice or a hearing. As we view it, this issue is intertwined with the question of whether the defendants were justified in condemning the properties in the first place. We have concluded that, if the plaintiffs

are able to prove that these condemnations lacked some form of exigency, they were entitled to notice or a hearing before these properties were closed. We have also found that there are factual disputes regarding whether the properties should not have been condemned at all. It follows from these factual disputes that the subsequent prohibited occupancy citations may have also been equally problematic since they too were issued without notice or a hearing and assessed a monetary penalty on the plaintiffs. Therefore, given the close connection between these fact-bound and factually contested claims, we find that the defendants' motion to dismiss is likewise denied as to this claim.

Lastly, we address the defendants' argument that certain named defendants should be dismissed under Count I of the plaintiffs' complaint since the plaintiffs failed to allege any facts which mention or involve these defendants. Specifically, the defendants claim that the plaintiffs fail to allege facts involving Defendants Courtright and Uher as to the William Street property, Defendants Courtright and Carmona as to the Willow Street Property, and Defendant Courtright as to the Philo Street property. The plaintiffs appear to rejoin that Defendant Courtright, as the mayor and ultimate decision maker for the City of Scranton, failed to prevent or remedy these due process violations occasioned by city officials working under his authority despite having notice from Garanin via May 23, 2019 letter, (see Doc. 1-5, 35), that these violations were occurring and ongoing. The plaintiffs do not appear

to have a similar counter as to Defendants Uher and Carmona for the William and Willow Street properties.

While we discern no direct reference to Defendant Uher in the plaintiffs' complaint regarding the William Street property, to Defendant Carmona regarding the Willow Street property, or to Defendant Courtright as to any of the aforementioned properties, we note that the plaintiffs' complaint is all-encompassing, stating generally that the defendants prevented the reopening of their properties and engaged in a continual pattern of harassment and delay with respect to same. To the extent that these allegations are meant to include Defendants Uher, Carmona, or Courtright, the plaintiffs should specifically state these facts and allegations, noting how these defendants were involved in this alleged pattern of conduct. Thus, we will grant the defendants' motion to dismiss as to the plaintiffs' claims in Count I as to Defendant Uher with respect to the William Street Property, Defendant Carmona with respect to the Willow Street property, and Defendant Courtright with respect to the William, Willow, and Philo Street properties. This dismissal is without prejudice, however, to allow the plaintiffs to amend their complaint accordingly, should these defendants be included in these claims within Count I of the complaint.[4]

---

[4] While this aspect of Garanin's procedural due process claim is flawed, we recognize that *pro se* plaintiffs should be afforded an opportunity to amend a complaint before the complaint is dismissed with prejudice, see Fletcher-Hardee

C.  **The Defendants' Motion to Dismiss Count II of the Plaintiffs' Complaint for Fourteenth Amendment Substantive Due Process Violations is Denied.**

The Fourteenth Amendment provides, in part, that "no State [shall] deprive any person of life, liberty, or property without due process of law . . . ." U.S. Const. Amend. XIV, § 1. The legal standards governing substantive due process claims are both familiar and exacting. In this context: "The Supreme Court has emphasized that the 'touchstone of due process' is protection against arbitrary government action. Government action is 'arbitrary in the constitutional sense' when it is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " L.R. v. Sch. Dist. of Philadelphia, 836 F.3d 235, 246 (3d Cir. 2016) (footnotes omitted). Thus:

> To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience . . . . Deprivation violates due process only when it shocks the conscience, which encompasses only the most egregious official conduct . . . while the meaning of the [shocks the conscience] standard varies depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to

Corp. v. Pote Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). In this case, the plaintiffs have not directly alleged facts that would implicate the above-mentioned defendants in a procedural due process claim. Nonetheless, out of an abundance of caution, and in order to preserve the plaintiffs' rights, this claim is dismissed without prejudice to the plaintiffs attempting to amend this federal complaint to state a claim upon which relief may be granted by including proper allegations against appropriate party-defendants that meet the requirements of federal law.

the merits of the underlying decision. <u>Chainey v. Street</u>, 523 F.3d 200, 219-20 (3d Cir. 2008) (internal citations and quotations omitted).

<u>L.H. v. Pittston Area Sch. Dist.</u>, 130 F. Supp. 3d 918, 928-29 (M.D. Pa. 2015), <u>aff'd</u>, 666 F. App'x 213 (3d Cir. 2016). Thus, determining what shocks the conscience is not a "precise" or technical exercise. <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 285 (3d Cir. 2004). The Supreme Court has noted, however, that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." <u>Lewis</u>, 523 U.S. at 849.

In this case, the plaintiffs have alleged that the defendants have arbitrarily condemned and subsequently delayed the release of the plaintiffs' properties from condemnation, refused to issue the permits necessary to operate these properties as rental properties, and delayed access to the appeals process after these properties were condemned. (<u>See</u> Doc. 1). The plaintiffs further allege that these delays are due to a personal vendetta that the defendants have against the plaintiffs, since they allegedly told the plaintiffs that their properties were "disgusting" and should be shut down. (<u>See</u> <u>id.</u>) The defendants rejoin that the plaintiffs have failed to plead sufficient facts to give rise to these serious allegations and that the complaint merely sets forth conclusory allegations mirroring the requirements for a substantive due process violation, rather than explicitly setting forth facts related to this claim. The defendants also allege that there are insufficient facts to implicate Defendant

Courtright in this claim, and that he should accordingly be dismissed from this action.

Although substantive due process claims must meet exacting standards of proof, out of an abundance of caution and reading the allegations in the complaint in the plaintiffs' favor, we find that the plaintiffs' substantive due process claim should survive the defendants' motion to dismiss. Recognizing that the plaintiffs' complaint does allege a substantive due process claim in a conclusory fashion which does not necessarily include all named defendants, we nonetheless note that the incorporation of the previous paragraphs allows the plaintiffs to cobble together what could be a valid substantive due process claim, if proven. These allegations articulate a claim based on the alleged selective enforcement of local rules and codes to suppress the plaintiffs' business activity. Since we find that such an allegation could support a substantive due process claim in this case, the plaintiffs' claim set forth in Count II will be permitted to proceed subject to further consideration of this claim on a fully documented motion for summary judgment. The defendants' motion to dismiss this count is accordingly denied.

**D.    The Defendants' Motion to Dismiss Count III of the Plaintiffs' Complaint for Fourteenth Amendment Equal Protection Violations is Denied.**

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. amend. XIV, § 1. The plaintiffs' equal protection argument in this case advances what is called a "class of one" claim—an assertion that the plaintiffs have been treated differently than all others in some invidious fashion. On this score, "cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000) (citing Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S. Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336, 109 S. Ct. 633, 102 L.Ed.2d 688 (1989)).

In order to sustain a "class of one" equal protection claim, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006). Thus, a plaintiff must "at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment." Phillips v. Cty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008). "[W]hen it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal

Protection Clause requires a rational basis for the difference in treatment." <u>Yan v. Penn State Univ.</u>, 2010 U.S. Dist. LEXIS 82812, *15 (M.D. Pa. 2010) (quoting <u>Engquist v. Oregon Dep't of Agriculture</u>, 553 U.S. 591, 128 S. Ct. 2146, 2152, 170 L. Ed. 2d 975 (2008) (internal citations and quotations omitted).

As to this first element—the requirement that the plaintiff be treated differently from others similarly situated—it has been held that:

> While " '[p]ersons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects,' " <u>Mun. Revenue Servs., Inc. v. McBlain</u>, 347 Fed. App'x 817, 825 (3d Cir. 2009) (quoting <u>Startzell v. City of Phila.</u>, 533 F.3d 183, 203 (3d Cir. 2008)), "the law in the Third Circuit does not require [the plaintiff] to show that the [comparators] are identical in all relevant respects but only that they are alike." <u>Southersby Dev. Corp. v. Borough of Jefferson Hills</u>, 852 F. Supp. 2d 616, 628 (W.D. Pa. 2012) (citing <u>Startzell</u>, 533 F.3d at 203); <u>see also</u> <u>Simmermon v. Gabbianelli,</u> 932 F. Supp. 2d 626, 632-33 (D.N.J. 2013); <u>Thomas v. Coopersmith</u>, No. 11–7578, 2012 WL 3599415, at *5 (E.D. Pa. Aug. 21, 2012). "Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry." <u>Chan v. Cnty. of Lancaster</u>, No. 10–3424, 2011 WL 4478283, at *15 (E.D. Pa. Sept. 26, 2011) (citing <u>Monaco v. Am. Gen. Assurance Co.</u>, 359 F.3d 296, 305 (3d Cir. 2004)).

<u>Borrell v. Bloomsburg Univ.</u>, 955 F. Supp. 2d 390, 405 (M.D. Pa. 2013).

Further, once a plaintiff has shown that he suffered some measure of disparate treatment as compared to others who were similarly situated, in order to ultimately prevail on a "class of one" equal protection claim:

> [A] plaintiff must show that the differential treatment was "irrational and wholly arbitrary." <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 286 (3d Cir. 2004) (quoting <u>Olech</u>, 528 U.S. at 564, 120 S. Ct. 1073) (internal quotation marks omitted). "These challenges fail when 'there

is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " Highway Materials, Inc. v. Whitemarsh Twp., 386 Fed. App'x 251, 259 (3d Cir. 2010) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993)).

Tucker Indus. Liquid Coatings, Inc. v. Borough of E. Berlin, 85 F. Supp. 3d 803, 811 (M.D. Pa. 2015), aff'd, 656 F. App'x 1 (3d Cir. 2016).

This rational basis test imposes only a minimal burden of justification upon those who are defending some government action. "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic' " of government activity. Heller v. Doe by Doe, 509 U.S. 312, 319, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting FCC v. Beach Comm'cns, Inc., 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L.Ed.2d 211 (1993)). "These challenges fail when there is any reasonably conceivable state of facts that could prove a rational basis for the classification." Giuliani v. Springfield Twp., 238 F. Supp. 3d 670, 705 (E.D. Pa. 2017), aff'd, No. 17-1675, 2018 WL 1167524 (3d Cir. Mar. 6, 2018) (quoting Hwy. Materials, 386 F. App'x at 259) (citations and quotation marks omitted). Nonetheless, in order to defeat a "class-of-one" equal protection claim where the plaintiff has sufficiently shown disparate treatment of similarly situated persons, it is necessary that the court be able to articulate some rational justification for the governmental action at issue in the lawsuit.

In this case, the plaintiffs have alleged that at least two other landlords in Scranton received different treatment from the defendants when they were denied a

permit due to deficiencies in rental registration fees or faced other problems with their properties. (Doc. 1, ¶¶ 133-35). Specifically, the plaintiffs claim that the defendants did not close these other landlords' properties despite their deficiencies while the plaintiffs' properties were closed down or condemned for similar violations. (Id.) The plaintiffs classify these actions as arbitrary, capricious, and without justification. For their part, the defendants assert that the plaintiffs have failed to provide "any specific facts as to a violation of their collective rights under the Equal Protection Clause, other than bare and conclusory language that the laws, ordinances, policies and procedures were applied more onerously to them than to other individuals and entities." (Doc. 14, 17). The defendants also claim that the plaintiffs have not alleged sufficient facts to implicate Defendant Courtright in this claim and that he should accordingly be dismissed from this action. While the plaintiffs' allegations may be conclusory, the complaint, at a minimum, raises a question regarding whether the defendants applied their policies or procedures in a discriminatory or different fashion to the plaintiffs—including Defendant Courtright. The plaintiffs have thus alleged specific instances of disparate treatment as required by this Circuit,[5] and that there was no rational basis for these specific

---

[5] Prof'l Dog Breeders Advisory Council, Inc. v. Wolff, 752 F. Supp. 2d 575, 586 (E.D. Pa. 2010) (citing Conklin v. Warrington Twp., 304 Fed. App'x 115 (3d Cir. 2008) (claim dismissed where litigant provided no specific instance(s) of defendant prothonotary handling any other litigant's documents differently or treating them differently otherwise); Young v. New Sewickley Twp., 160 F. App'x 263, 266 (3d

instances of disparate treatment. These allegations are sufficient at the pleading stage of the litigation to state a claim upon which relief may be granted. Whether Garanin can prove what he has alleged must await another day.

In contrast, we find that the defendants are silent on the issue of whether there was some rational basis for treating the plaintiffs differently than other similarly situated landlords as the plaintiffs have alleged. While proving the lack of a rational basis for some government action is a daunting burden for the plaintiffs, and suggesting some conceivable rational basis for governmental decision-making is an extremely modest requirement for the defendants, at present, there is simply a legal and factual void on this issue—a void which we should not endeavor to fill through our own speculation. Therefore, we will deny this motion to dismiss without prejudice to the submission of a more fulsome summary judgment motion by the defendants addressing all of the elements of a "class-of-one" equal protection claim.

We note that denial of this motion by no means guarantees legal success to the plaintiffs on this equal protection claim. Quite the contrary, it is well-settled that government officials may draw distinctions between persons in land use matters,

---

Cir. 2005) (claim dismissed where disgruntled police officer failed to provide any specific instance(s) of other police officer employees being treated in a dissimilar manner); see also Perano v. Tilden Twp., No. 09-00754, 2010 U.S. Dist. LEXIS 36781, at *31-32 (E.D. Pa. Apr. 12, 2010) (claim dismissed where plaintiff failed to adequately demonstrate how mobile home developers were similarly situated to high end real estate developers or commercial businesses in the region, to ultimately establish differential treatment)).

provided that these distinctions are not "irrational and wholly arbitrary." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir. 2004) (quoting Olech, 528 U.S. at 564, 120 S. Ct. 1073) (internal quotation marks omitted). Accordingly, "[t]hese ['class-of-one' equal protection] challenges fail when 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " Highway Materials, Inc. v. Whitemarsh Twp., 386 Fed. App'x 251, 259 (3d Cir. 2010) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993)); see Tucker Indus. Liquid Coatings, Inc. v. Borough of E. Berlin, 85 F. Supp. 3d 803, 811 (M.D. Pa. 2015), aff'd, 656 F. App'x 1 (3d Cir. 2016). The plaintiffs are therefore cautioned that they face a high burden on this claim going forward.

### E. The Defendants' Motion to Dismiss Count IV of the Plaintiffs' Complaint for First Amendment Retaliation Claims is Granted.

To state a First Amendment claim for retaliation, a plaintiff must allege that: (1) he was engaged in constitutionally protected conduct; (2) he was retaliated against by someone acting under color of state law in a way that was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) there is a causal link between the protected conduct and the retaliatory action. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). Thus, "[t]he threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation." Eichenlaub v. Township of Indiana, 385 F.3d 274, 282 (3d Cir. 2004).

At the outset, we note that there is a certain enigmatic quality to the plaintiffs' First Amendment claims. Specifically, the plaintiffs' complaint alleges that:

> The Defendants acted arbitrarily and in bad faith[] in retaliation for Plaintiffs' exercise of their First Amendment Rights to free speech and to petition the government when the CITY:
>
>> improperly denied the permits to a GARANIN affiliated entity, FERNDRIVE LLC, and thereby prevented repairs on the SCHOOL STREET PROPERTY;
>>
>> issued capricious citations for unauthorized occupancy on the WILLIAM STREET PROPERTY while there is a pending appeal;
>>
>> and failed to reschedule the PHILO STREET PROPERTY inspection even though the inspection fee had been paid and all other requirements met.
>
> The Defendants' retaliatory actions violate the Plaintiffs' First Amendment rights to free speech and to petition the government.

(Doc. 1, ¶¶ 163-64). Based on the other portions of the plaintiffs' complaint and subsequent briefing on this motion, we gather that the plaintiffs' retaliation claim is based on "the initial filing of GARANIN I and [its] continued litigation" and the pending appeals of the William Street property condemnation. (Doc. 17, 20). While we find that the plaintiffs have established the first element of a First Amendment retaliation claim, in that the plaintiffs have shown that they engaged in protected activity by filing appeals with the courts, we do not discern either that the claimed retaliation that the plaintiffs faced was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights," or a causal link between the

protected conduct and the alleged retaliatory action taken by the defendants. Of particular concern is that there is nothing in the plaintiffs' complaint to link the alleged retaliation in the form of disparate treatment from the defendants to the plaintiffs' engagement in the appeals process regarding their properties aside from the plaintiffs' conclusory statements.

Reading the complaint generously, as we must, the only allegation therein, which, if true, could raise an inference of retaliatory conduct based solely on timing is that Defendant Hinton refused to reschedule an inspection of the Philo Street property after Garanin turned down a settlement offer from Hinton before the Board of Appeals hearing on this property's closure. This assertion, however, suffers from ambiguities with the chain of events and causation. Specifically, the plaintiffs allege that:

> On April 29, Officer UHER advised GARANIN that ROCK PROPERTY has to pay "$350 for inspection and $300 more for rental fee" to have the PHILO STREET property reopened.
>
> ROCK PROPERTY paid the $650 fee as requested by OFFICER UHER with the inspection fee included.
>
> On April 30, 2019, Officer UHER confirms that the inspection at the PHILO STREET PROPERTY is scheduled for **May 6, 2019** at 11:00AM (Exhibit 34).
>
> GARANIN on behalf of ROCK PROPERTY requested for the CITY to reschedule the inspection in light of the forthcoming Board of Appeals hearing scheduled for May 16, 2019.

On **May 16, 2019** immediately prior to the Board of Appeals hearing, Director HINTON reached out to GARANIN offering a settlement and confirming that the PHILO STREET PROPERTY's inspection was rescheduled.

On May 16, 2019 GARANIN and Director HINTON met to discuss settlement terms.

GARANIN refused the settlement.

In retaliation, Director HINTON refused to grant the rescheduled inspection for the PHILO STREET PROPERTY.

(Doc. 1, ¶¶ 117-24) (internal citations omitted); (see also Doc. 1-6, 12, 16, 19-20).

As it appears in the complaint, we are unsure of how Defendant Hinton could have refused to reschedule an inspection before the Board of Appeals hearing on May 16, 2019 when such inspection should have already been completed on May 6, 2016—ten days earlier. We garner some clarity on this score from the attached exhibits to the plaintiffs' complaint.[6] In an email exchange between Garanin and Defendant Uher, it appears as though an inspector had arrived at the Philo Street property at the scheduled place and time on May 6, 2019, but that Garanin had turned the inspector away under the impression that the inspection had been rescheduled. (Doc. 1-6, 16, 19-20). Thus, we are faced with the ambiguity of whether Garanin's

---

[6] We may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). The defendants do not appear to raise any objection to the use of these documents, so we consider them here.

refusal to settle before the Board of Appeals hearing on May 16, 2019, Garanin turning away the initial inspector, or some other reason caused Defendant Hinton to refuse to reschedule the inspection of the Philo Street property. We will not speculate as to the cause of Defendant Hinton's actions in this vague area of the plaintiffs' pleadings. Therefore, absent a causal link between the protected conduct and the retaliatory action, the defendants' motion to dismiss the plaintiffs' First Amendment retaliation claim is granted, but simply note that the facts as alleged in the complaint currently di onto give rise to a causal inference. The plaintiffs may have leave, however, to amend their pleadings to clarify these ambiguities and to address all elements of a First Amendment retaliation claim.[7]

F. **The Defendants' Motion to Dismiss Count V of the Plaintiffs' Complaint for Fourth and Fourteenth Amendment Unreasonable Search and Seizure Violations is Granted in Part and Denied in Part.**

Count V of the plaintiffs' complaint asserts a violation of the Fourth and Fourteenth Amendments to the U.S. Constitution for unreasonable search and

---

[7] We reiterate that *pro se* plaintiffs should be afforded an opportunity to amend a complaint before the complaint is dismissed with prejudice, see Fletcher-Hardee Corp. v. Pote Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). Out of an abundance of caution, and in order to preserve the plaintiffs' rights, this claim is dismissed without prejudice to the plaintiffs attempting to amend their complaint to state a claim upon which relief may be granted by including proper allegations against appropriate party-defendants that meet the requirements of federal law, provided that the plaintiffs acts within 21 days of the entry of any dismissal order.

seizure. In particular, the plaintiffs claim that "Inspector CARMONA's constant surveillance of the WILLIAM STREET PROPERTY and subsequent entry onto the backyard of the WILLIAM STREET PROPERTY without a warrant or the owner's consent" and "[t]he CITY's capricious and arbitrary denial of the permits on the SCHOOL STREET PROPERTY and meritless refusal to lift the closure of the WILLOW STREET PROPERTY and the PHILO STREET PROPERTY" constituted an unreasonable search and seizure and *de facto* seizure, respectively. (Doc. 1, ¶¶ 167-68). The defendants rejoin that no facts were alleged in the plaintiffs' complaint to implicate Defendant Uher as to the William Street property, Defendants Carmona and Uher as to the School Street property, Defendant Carmona as to the Willow Street property, or Defendant Courtright as to all of the above-mentioned properties. The defendants also claim that there is no factual support for the notion that Defendant Carmona was on the plaintiffs' William Street property, but that in any event, she should be entitled to qualified immunity. Lastly, the defendants generally reassert their entitlement to qualified immunity.

As we have previously discussed in Count I, while we discern no direct reference to Defendant Uher in the plaintiffs' complaint regarding the William Street property, to Defendant Carmona and Uher regarding the School Street property, to Defendant Carmona as to the Willow Street property, or Defendant Courtright as to any of these properties, we note that the plaintiffs' complaint is all-encompassing,

stating generally that the defendants prevented the reopening of the properties and acted "intentionally, willfully, and recklessly to unlawfully implement the policies and procedures of the CITY and deprive the Plaintiffs of their constitutional rights[.]" (Doc. 1, ¶ 169). To the extent that these allegations are meant to include Defendants Uher, Carmona, or Courtright, the plaintiffs should specifically state these facts and allegations, including how these defendants were involved in this pattern, in an amended complaint. Thus, we will grant the defendants' motion to dismiss the plaintiffs' claims in Count V as to Defendants Uher and Courtright with respect to the William Street Property, Defendants Carmona, Uher, and Courtright with respect to the School Street property, and Defendants Carmona and Courtright with respect to the Willow Street property.[8]

We thus move to the defendants' second and third defenses that even if Defendant Carmona was on the plaintiffs' William Street property, she was entitled to qualified immunity for her actions, and that the remaining defendants are likewise entitled to qualified immunity on this Count. We reiterate our earlier conclusion that

---

[8] While this claim is flawed, we recognize that *pro se* plaintiffs should be afforded an opportunity to amend a complaint before the complaint is dismissed with prejudice, see Fletcher-Hardee Corp. v. Pote Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). While the plaintiffs have not directly alleged facts that would implicate the above-mentioned defendants in this Fourth and Fourteenth Amendment claim, out of an abundance of caution, and in order to preserve the plaintiffs' rights, this claim is dismissed without prejudice.

qualified immunity is unavailable to the defendants at this juncture due to factual disputes which require us to look beyond the complaint and weigh differing factual accounts and evidence, which are prevalent here. We do, however, take up the question of whether Defendant Carmona's alleged surveillance and trespass on the William Street property violated the plaintiffs' constitutional rights.

On this score, we restate the familiar principle that the Fourth Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment, protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Administrative searches, such as for code and zoning enforcement, can constitute 'significant intrusions upon the interests protected by the Fourth Amendment . . . .' " Lease v. Fishel, No. 07-cv-0003, 2010 U.S. Dist. LEXIS 31837, 2010 WL 1390607, at *7 (M.D. Pa. Mar. 31, 2010) (citing Camara v. Mun. Court of City and County of San Francisco, 387 U.S. 523, 534, 87 S. Ct. 1727, 18 L. Ed.2d 930 (1967)). The threshold inquiry for such a claim is whether the government's conduct amounted to a "search." Id. (citing United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006)). A search occurs for Fourth Amendment purposes when "the government violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (citing Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)).

The Supreme Court has also taken up the question of the propriety of administrative searches:

> Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant. See, e.g., Stoner v. State of California, 376 U.S. 483, 84 S. Ct. 889, 11 L.Ed.2d 856; United States v. Jeffers, 342 U.S. 48, 72 S. Ct. 93, 96 L.Ed. 59; McDonald v. United States, 335 U.S. 451, 69 S. Ct. 191, 93 L.Ed. 153; Agnello v. United States, 269 U.S. 20, 46 S. Ct. 4, 70 L.Ed. 145. As the Court explained in Johnson v. United States, 333 U.S. 10, 14, 68 S. Ct. 367, 369, 92 L.Ed. 436:
>
>> 'The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.'

Camara v. Municipal Court of the City & County of San Francisco, 387 U.S. 523, 528-29, 87 S. Ct. 1727, 18 L.Ed.2d 930 (1967). Further, administrative searches "authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual[,]" and are thus "significant intrusions upon the interests protected by the Fourth Amendment[.]"

The Court qualified its decision, however, noting that:

[s]ince our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S. Ct. 101, 53 L.Ed. 195, 6 Ohio L. Rep. 665 (seizure of unwholesome food); Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S. Ct. 358, 49 L.Ed. 643 (compulsory smallpox vaccination); Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health, 186 U.S. 380, 22 S. Ct. 811, 46 L.Ed. 1209 (health quarantine); Kroplin v. Truax, 119 Ohio St. 610, 7 Ohio Law Abs. 110, 165 N.E. 498 (summary destruction of tubercular cattle). On the other hand, in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day. Moreover, most citizens allow inspections of their property without a warrant. Thus, as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry. Similarly, the requirement of a warrant procedure does not suggest any change in what seems to be the prevailing local policy, in most situations, of authorizing entry, but not entry by force, to inspect.

387 U.S. at 539-40.

Against this legal backdrop, we face challenges with evaluating the plaintiffs' claims, given the sparse factual allegations in the complaint regarding Defendant Carmona's interactions with the William Street property. At the outset, this ambiguity pertains to the nature and extent of Defendant Carmona's alleged surveillance of the property, and thus, whether "the government violate[d] a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (citing Katz

v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)). For instance, if Defendant Carmona merely walked or drove down William Street each day, or perhaps multiple times per day, while intentionally and deliberately passing the plaintiffs' property each time she did so, we would have no grounds to find a constitutional violation since society neither expects nor anticipates that the exterior of a property is private. However, if Defendant Carmona set up cameras or recording devices inside this property, then we would have the kind of violation cognizable under the constitution. Recognizing that neither extreme is likely the case here, we note that there is a void in the complaint regarding precisely which camp of surveillance was at issue. Given this ambiguity in Garanin's complaint, we will grant the motion to dismiss this aspect of the complaint, doing so without prejudice to Garanin filing an amended complaint which alleges well-pleaded facts describing how this alleged surveillance violated the plaintiffs' constitutional rights.

In contrast, the plaintiffs' claim for unreasonable seizure of their properties is presented with fewer ambiguities. According to the Third Circuit:

The . . . proper standard for such alleged violations [is] as follows:

Under the Fourth Amendment, a "seizure" of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." Soldal v. Cook Cnty., 506 U.S. 56, 61, 113 S. Ct. 538, 121 L.Ed.2d 450 (1992) (citation and internal quotation marks omitted). "[S]eizures of property are subject to Fourth Amendment scrutiny even though no search

within the meaning of the Amendment has taken place." Id. at 68. This Fourth Amendment right against unreasonable seizure is "transgressed if the seizure of [a person's] house was undertaken to . . . verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." Id. at 69.

Marcavage v. Borough of Lansdowne, Pa., 493 Fed. App'x 301, 307 (3d Cir. 2012) (citing Marcavage v. Borough of Lansdowne, Pa., 826 F. Supp. 2d 732, 745 (E.D. Pa. 2011)).

The plaintiffs' complaint indicates that the closure of these properties constituted an unreasonable seizure under the Fourth Amendment because it interfered with their possessory interests in receiving rent from current or potential tenants and because the actions of the defendants were arbitrary and capricious both in imposing and subsequently refusing to lift these condemnations. These claims, if proven could give rise to a cognizable claim under the Fourth Amendment, assuming that these closures were meritless or "on a whim, for no reason at all." Marcavage, 493 Fed. App'x at 307. The defendants' motion to dismiss is thus denied on this claim.

### G. The Defendants' Motion to Dismiss Count VI of the Plaintiffs' Complaint for *Monell* Liability is Denied.

Count VI of the plaintiffs' complaint sets forth a claim under 42 U.S.C. § 1983 for Monell liability under a failure to train theory. Consideration of the defendants' corresponding motion to dismiss this count must take into account the substantive

legal standards which govern federal civil rights liability for municipalities. It has long been established that municipalities and other local governmental entities or officials may not be held liable under federal civil rights laws for the acts of their employees under a theory of *respondeat superior* or vicarious liability. Ashcroft v. Iqbal, 556 U.S. 662 (2009); see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). However, they may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). To sustain a Monell municipal liability claim a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" to prevail. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997). This custom must be "so widespread as to have the force of law." Id. at 404; see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404). A

municipality can be held liable on the basis of failure to train when "that failure amounts to 'deliberate indifference . . . [of the constitutional] rights of persons. . . .' " Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citations omitted). There must also be a causal nexus, in that the " 'identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.' " Id. at 325 (citations omitted).

Thus, any analysis of a claim under Monell requires separate consideration of two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so whether the [municipality] is responsible for that violation." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992). Thus, a municipality or other local government may be liable under this section only if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. Connick v. Thompson, – U.S. –, 131 S. Ct. 1350, 1359 (2011); Monell, 436 U.S. at 692. However, under § 1983, local governments are responsible only for "their own illegal acts," and "are not vicariously liable under § 1983 for their employees' actions." Connick, 131 S. Ct. at 1359. Accordingly, plaintiffs who seek to impose liability on local governments for federal civil rights violations must prove that "action pursuant to official municipal policy" caused the injury complained of. Id. (citing Monell, 436 U.S. at 691).

Guided by these threshold principles, the Third Circuit Court of Appeals has further explained that there are "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983:"

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted). Subsequently, the appeals court provided further guidance regarding the ways in which a government policy or custom may be established:

> We have also observed that a government policy or custom can be established in two ways. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990). The plaintiffs may establish a government policy by showing that a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issued an official statement of policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986). The plaintiffs may establish that a course of conduct constitutes a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" that they operate as law. Monell, 436 U.S. at 690, 98

> S. Ct. 2018. In either instance, the plaintiffs have the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom. Andrews, 895 F.2d at 1480. We have also held that, at a minimum, the government must act with deliberate indifference to the purported constitutional deprivation in order to ground liability. San Filippo v. Bongiovanni, 30 F.3d 424, 445 (3d Cir. 1994).

Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007).

These general legal tenets apply with particular force to Monell claims based, in part, upon an alleged failure to train public officials. Such claims survive only in very compelling circumstances. As the Supreme Court explained in Connick, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Id. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id.; Oklahoma City v. Tuttle, 471 U.S. 808, 822-823 (1985) (plurality) ("[A] 'policy' of 'inadequate training' is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). Accordingly, in order to bring a viable claim for municipal liability under § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989). Deliberate indifference is a stringent standard, and requires proof that a

municipality disregarded a known or obvious consequence of an omission in a municipality's training program. Id. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (quoting Bd. of County Commn'rs of Bryan County v. Brown, 520 U.S. 397, 409 (1997)).

In cases where a plaintiff bases a Monell claim on an alleged failure to train officers or other employees, the Third Circuit has further explained:

> a . . . failure to train . . . only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989). We have held that a failure to train, discipline or control can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate. See Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997).

Montgomery v. De Simone, 159 F.3d 120, 126-27 (3d Cir. 1998).

It is "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." Harris, 489 U.S. at 389. Thus, where Monell claims are based upon an alleged failure to train officers, the municipality's training program must be so inadequate that "in light of the duties assigned to specific officers or employees the need for more or

different training is so obvious, and the inadequacy [of the current training] so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390.

"Establishing municipal liability on a failure to train claim under § 1983 is difficult." Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).

> Generally, deficient training can only amount to the requisite deliberate indifference "where the failure to train has caused a pattern of violations." Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). However, an exception exists and a "failure to train" Monell claim may proceed absent a pattern of violations only where (1) "a violation of federal rights may be a highly predictable consequence of a failure to equip . . . officers with specific tools [or skills] to handle recurrent situations," and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights "could justify a finding that [the] policymakers' decision not to train an officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." Kline, 255 Fed. App'x at 629 (quoting Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 409, 117 S. Ct. 1382, 1391 137 L.Ed.2d 626, 642 (1997)).

White v. Brommer, 747 F. Supp. 2d 447, 463 (E.D. Pa. 2010).

Yet while Monell failure-to-train claims must meet exacting legal standards, it is also important to note that this court is required to liberally construe a *pro se* plaintiff's pleadings; "however inartfully pleaded," the "allegations of [a] *pro se* complaint [are held] to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L.Ed.2d 652 (1972). In doing so, the court is to "apply the applicable law irrespective of whether a *pro se*

litigant has mentioned it by name." <u>Higgins v. Beyer</u>, 293 F.3d 683, 687 (3d Cir. 2002). Nevertheless, a court need not credit a plaintiff's "bald assertions" or "legal conclusions." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).

It is against these legal benchmarks that we assess the instant motion to dismiss. Initially, the plaintiffs must identify the specific policies or customs which have given rise to their constitutional violations, rather than generally concluding or alleging that such violations have occurred. Upon review, the plaintiffs have failed to provide any direct reference to a specific policy or custom of the defendants which would have caused these constitutional violations described in the plaintiffs' complaint. Were this a counseled complaint, we would find this omission fatal to the plaintiffs' claim. Mindful, however, of the fact that these plaintiffs proceed *pro se*, and that we are thus enjoined to liberally construe their pleadings, we gather from the complaint and its accompanying documents that the plaintiffs intend to proceed under a failure to train theory of liability. Specifically, it appears that Garanin's complaint, read as a whole, alleges that the defendants failed to train employees or officials that either notice or a hearing is required before closing or condemning personal property, unless in the case of a true emergency. Construed in this fashion, we find that the causal nexus between the identified deficiency in the defendants' training program and the ultimate constitutional injury is clear: by not training employees and officials that a pre-deprivation notice or hearing is required,

employees and officials condemned and closed properties without notice or a hearing. This having been established, we move to a discussion of whether we are presented with a "pattern of similar constitutional violations by untrained employees[,]" Connick, 563 U.S. at 62, which would establish deliberate indifference on the part of the City.

Plainly from the plaintiffs' complaint, they have alleged a pattern of constitutional violations, asserting that the defendants closed and condemned at least four of the plaintiffs' properties without either notice or a hearing under the guise that there was a public health or safety risk associated with each of these properties—which the plaintiffs vehemently deny. After these closures, the plaintiffs attempted to resolve the issues that caused the defendants to close their properties, and consistently requested that the defendants provide either notice or a hearing regarding these issues before the defendants took action to close or condemn properties in the future. According to the plaintiffs, these requests were ignored. Moreover, the plaintiffs, via Garanin, wrote a letter to Mayor Courtright advising him of these ongoing violations and requesting that he do something to remedy the situation. This letter likewise went allegedly unanswered. We find these collective allegations sufficient to set forth a claim of deliberate indifference on the part of all Defendants for purposes of this motion to dismiss. We will, therefore, deny the motion to dismiss on this count, doing so without prejudice to the defendants raising

the issue again in a later motion for summary judgment on a more complete factual record.

### H. The Defendants' Motion to Dismiss Count VII of the Plaintiffs' Complaint for Malicious Prosecution is Granted.

In Count VII of the plaintiffs' complaint, they allege a claim for malicious prosecution under 42 U.S.C. § 1983. (Doc. 1, ¶ 11, see generally Count VII). In order to establish and ultimately prevail on a § 1983 claim for malicious prosecution, a plaintiff must show:

(1) the defendants initiated a criminal proceeding;

(2) the criminal proceeding ended in the plaintiff's favor;

(3) the proceeding was initiated without probable cause;

(4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003).

In DiBella v. Borough of Beachwood, 407 F.3d 599 (3d Cir. 2005), the Third Circuit explained that a plaintiff bringing a claim for malicious prosecution under the Fourth Amendment must demonstrate a seizure as a fundamental element of the claim because "prosecution without probable cause is not, in and of itself, a constitutional tort." Id. at 603 (quoting Gallo v. City of Philadelphia, 161 F.3d 217, 222). Indeed, "[t]he type of constitutional injury the Fourth Amendment is intended

to redress is the deprivation of liberty accompanying prosecution, not prosecution itself." Id. As examples of the kinds of seizures that may support a claim for malicious prosecution, the Third Circuit observed that "[p]retrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure." Id. In contrast, the mere attendance at one's trial on criminal charges does not qualify as a seizure that will support a claim for malicious prosecution. Id. Thus, constitutional false arrest and malicious prosecution claims often focus on the physical restraint of a person.

In this case, we see no evidence on the pleadings before us to meet the fifth and final element of this claim. The plaintiffs appear to argue that they were constitutionally deprived of the William Street property after it was condemned by the defendants and that this deprivation should meet the constitutional standard for a malicious prosecution claim in a § 1983 action. The plaintiffs misconstrue the requirements for this element. Merely depriving the plaintiffs of access to their property is not the kind of seizure contemplated by the Fourth Amendment. Indeed, we reiterate that examples of the kinds of seizures that may support a claim for malicious prosecution under the Fourth Amendment include personal "[p]retrial custody and some onerous types of pretrial, non-custodial restrictions." DiBella, 407 F.3d at 603. There are no factual averments before us that any plaintiffs were arrested, detained, or subject to "some onerous types of pretrial non-custodial

restrictions," id., other than having to defend these actions. Thus, the plaintiffs have failed to meet their burden on this score, and the defendants' motion to dismiss this claim is granted without prejudice to the plaintiffs amending their complaint within the timeframe prescribed.[9]

I. **The Defendants' Motion to Dismiss Count VIII of the Plaintiffs' Complaint for Tortious Interference with Existing and Prospective Business and Contractual Relations is Granted in Part and Denied in Part.**

Count VIII of the plaintiffs' complaint sets forth a claim for tortious interference with existing and prospective business and contractual relationships. Under Pennsylvania law, the elements for this claim are as follows:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

---

[9] The plaintiffs argue for the first time in their brief that they bring this malicious prosecution claim not under federal law, but under Pennsylvania's malicious prosecution statute, 42 Pa. C.S. § 8351, which is substantially similar to a federal law claim, absent the fifth and final element. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 2000); Henderson v. City of Phila., 853 F. Supp. 2d 514, 518 (E.D. Pa. 2012). We cannot consider this claim through this legal lens, however, since it is well-settled that a plaintiff cannot amend a complaint through the filing of a brief, or through arguments set forth in a brief opposing a dispositive motion. Indeed, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Pennsylvania ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir. 1988) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)); cf. Frederico v. Home Depot, 507 F.3d 188, 202 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [a] complaint under Rules 9(b) and 12(b)(6)."). Accordingly, we will allow the plaintiffs leave to amend their complaint to either allege facts sufficient to meet their burden for this claim under federal law, or to set forth a claim for malicious prosecution under Pennsylvania law.

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

Pelagatti v. Cohen, 370 Pa. Super. 422, 536 A.2d 1337, 1343 (Pa. Super. 1988), app. denied, 548 A.2d 256 (Pa. 1988). The Pennsylvania Supreme Court has clarified that a prospective contractual relation "is something less than a contractual right, something more than a mere hope." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979).

As to these state law claims, we find that the plaintiffs have alleged sufficient facts to survive the defendants' motion to dismiss. The plaintiffs claim that they invested in the properties at issue through initial purchases and renovations with the expectation of making a profit from them through rental income and contracts with present and future tenants. In fact, the plaintiffs had existing leases with tenants who were living in these properties at the time they were either closed or condemned. By condemning or closing these properties and issuing citations for prohibited use when tenants continued to reside in the properties, the defendants interfered with these relationships, specifically intending to end the leases and remove the existing tenants from occupancy. Whether the defendants had a privilege to do so is a question of

fact which calls us to consider matters outside the pleadings and to weigh evidence which we may not do on a motion to dismiss. Thus, at a minimum, the plaintiffs have raised a dispute of fact regarding whether the defendants were privileged to interfere with these relationships. Lastly, the plaintiffs have alleged legal damage as a result of the defendants' conduct in the form of lost profits and an impaired reputation since their properties were condemned and closed. This claim therefore survives the defendants' motion to dismiss. We deny this motion without prejudice, however, to the defendants renewing it upon a more detailed factual record in a properly raised motion for summary judgment.

The defendants last assert that the plaintiffs failed to allege sufficient facts to implicate Defendant Courtright in this claim and that he should accordingly be dismissed from this claim. While we discern no direct reference to Defendant Courtright in the plaintiffs' complaint regarding these claims, we note that the plaintiffs' complaint is all-encompassing, stating generally that the defendants engaged in a continual pattern of interference with the plaintiffs' rental business. To the extent that these allegations are meant to include Defendant Courtright, the plaintiffs should specifically state these facts and allegations, noting how these defendants were involved in this pattern. Thus, we will grant the defendants' motion to dismiss Defendant Courtright as to the plaintiffs' claims in Count VIII without

prejudice to Garanin attempting to file an amended complaint which set forth well-pleaded facts implicating this defendant in wrongful conduct.

**J.** **The Defendants' Motion to Dismiss the Plaintiffs' Punitive Damages Claims is Granted in Part and Denied in Part.**

The defendants argue that punitive damages are inappropriate as to the City of Scranton and the remaining defendants both in their official and individual capacities. While appearing to concede that their claims against the City and the defendants in their official capacity cannot stand, the plaintiffs instead counter that they have alleged sufficient facts to justify their punitive damages claims against the defendants in their individual capacities. We agree with the plaintiffs.

As to the City of Scranton and the Defendants in their official capacity, the law is clear that a punitive damages claim cannot stand. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748, 2762, 69 L.Ed.2d 616 (1981) (It is well-settled that "a municipality is immune from punitive damages under 42 U.S.C. § 1983."). Thus, this punitive damage claim as to these defendants is dismissed.

Although punitive damages are not available against the municipal entity and against the defendants in their official capacity, plaintiffs may seek punitive damages against defendants in their individual capacity. "In order to obtain such damages, [the] plaintiff[s] must establish facts of record that prove that the individuals knowingly and maliciously deprived [the] plaintiffs of their civil rights." Ruiz v.

<u>Philadelphia Hous. Auth.</u>, 1998 U.S. Dist. LEXIS 3925 CIV. No. 96-7853, 1998 WL

159038, at *10 (E.D. Pa. March 17, 1998). The Third Circuit has stated that

> for a plaintiff in a § 1983 case to qualify for a punitive award, the
> defendant's conduct must be, at a minimum, reckless or callous.
> Punitive damages might also be allowed if the conduct is intentional or
> motivated by evil motive, but the defendant's action need not
> necessarily meet this higher standard.

<u>Savarese v. Agriss</u>, 883 F.2d 1194, 1204 (3d Cir. 1989) (citing <u>Smith v. Wade</u>, 461

U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).

Further, because the question of whether punitive damages are proper often

turns on the defendants' state of mind, this question frequently cannot be resolved

on the pleadings alone, but must await the development of a full factual record at

trial. <u>See generally</u> <u>In re Lemington Home for the Aged</u>, 777 F.3d 620, 631 (3d Cir.

2015). Therefore, where a plaintiff's right to punitive damages may turn on the

significance afforded to disputed factual questions, defendants are not entitled to a

judgment in their favor on the plaintiff's punitive damages claims as a matter of law

at the outset of this litigation. <u>See</u> <u>Burke v. TransAm Trucking, Inc.</u>, 605 F. Supp.

2d 647, 649 (M.D. Pa. 2009); <u>Garden State Tire Realty Corp. v. R.K.R. Hess</u>

<u>Assocs., Inc.</u>, 762 F. Supp. 92, 93 (M.D. Pa. 1990).

In this case, the question of whether the plaintiffs can sustain individual

capacity punitive damage claims entails a consideration of factual matters beyond

the pleadings, and may not be undertaken through a motion to dismiss. Thus, to the

extent that the defendants seek dismissal of punitive damages claims against them in their individual capacity, these requests are denied without prejudice, subject to a proper motion for summary judgment on a complete factual record.

### K. The Defendants' Alternative Motion to Consolidate is Granted in Part and Denied in Part.

The defendants have also moved the Court to consolidate both of the actions identified above on the grounds that each of these cases arose out of the same alleged incidents, occurred during roughly the same time, in the same place, and involves the same defendants. As a result, the defendants contend that each of these actions involve the same facts and common legal questions, and that any relief accorded in one suit will directly affect and possibly control the relief accorded in the other suit. In addition, the defendants submit that consolidation of these actions is desirable because it will avoid the need to manage multiple lawsuits, will therefore conserve judicial resources, and will reduce costs that would otherwise be incurred by all parties.

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[i]f actions before the court involve a common question of law or fact, the court may: . . . (2) consolidate the actions." Fed. R. Civ. P. 42(a). Accordingly, a threshold requirement for consolidation is whether there exists a common question of law or fact. In re Consol. Parlodel Litig., 182 F.R.D. 441, 444 (D.N.J. 1998). Although the existence of common issues is a prerequisite for consolidation, the mere fact that multiple

actions involve common issues of fact or law does not compel consolidation. Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp., 149 F.R.D. 65, 80 (D.N.J. 1993). Rather, a court may consolidate cases if, in its discretion, "consolidation would facilitate the administration of justice." Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc., 775 F. Supp. 759, 761 (D. Del.1991).

A district court has broad power and discretion when determining whether consolidation is appropriate. Liberty Lincoln Mercury, 149 F.R.D. at 80. In the exercise of this discretion, a court should weigh the benefits of judicial economy against the potential for new delays, expense, confusion, or prejudice. Id. A motion to consolidate may be denied if the common issue is not a principal one, if it will cause delay in one of the cases, or will lead to confusion or prejudice in the trial of a case. See 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2382 (Civil 2d. 1995). "Where the evidence in one case is not relevant to the issues in the other, consolidation would create a likelihood of prejudice by confusing the issues." Liberty Lincoln Mercury, Inc., 149 F.R.D. at 81.

Applying these principles to the defendants' motion, and in the exercise of our broad discretion with respect to matters of case management, we find it appropriate to grant the motion in part and defer it in part. We choose to grant this motion in part solely for purposes of the parties conducting settlement discussions, recognizing that these cases are in vastly different procedural postures and that Garanin I is a

counseled petition, whereas the instant case involves a *pro se* litigant. Despite these differences, we find that global settlement discussions would prove potentially beneficial for all parties and would address the defendants' concerns that any potential award in one case could directly affect and possibly control the relief accorded in the other suit. Due to the stark contrast in procedural positioning between these two cases, we will defer ruling on the defendants' motion to consolidate until the conclusion of settlement negotiations between the parties.

Presently the parties in <u>Garanin I</u> are scheduled to report to the court on their willingness to engage in settlement discussion by January 31, 2020. We will, therefore, consolidate these cases for settlement discussion purposes and require the parties in this lawsuit to also report to us by January 31, 2020 whether they are willing to engage in settlement negotiations.

### III.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the defendants' motion to consolidate (Doc. 7) is GRANTED, in part, solely for purposes of global settlement discussions, and purposes the parties in this lawsuit will report to us by January 31, 2020 whether they are willing to engage in settlement negotiations. As for further consolidation of these actions, we will DEFER any decision on this issue pending the outcome of this mediation.

The defendants' motion to dismiss (Doc. 7) is GRANTED, in part, and DENIED, in part, as follows: As to Count I the motion is GRANTED, in part, to remove the claims against Defendants Courtright and Uher as to the William Street property, Defendants Courtright and Carmona as to the Willow Street property, and Defendant Courtright as to the Philo Street property. Count I is DENIED, in part, as to the remainder of the plaintiffs' claims.

Count II is DENIED.

Count III is DENIED.

Count IV is GRANTED.

Count V is GRANTED, in part, to remove the claims against Defendants Uher and Courtright as to the William Street property, Defendants Carmona, Uher, and Courtright as to the School Street property, and Defendants Carmona and Courtright as to the Willow Street property, as well as any factually undeveloped claims regarding surveillance by Defendant Carmona. Count V is DENIED, in part, as to the remainder of the plaintiffs' claims.

Count VI is DENIED.

Count VII is GRANTED.

Count VIII is GRANTED, in part, as to Defendant Courtright, and DENIED, in part, as to the remainder of Count VIII.

The defendants' motion to dismiss the punitive damage claims is GRANTED as to the City of Scranton and the defendants in their official capacities and DENIED as to the defendants in their individual capacities.

An appropriate order follows.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED:     December 17, 2019

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VSEVOLOD GARANIN, et al.      :      **Civil No. 3:19-CV-1275**

                                    :

**Plaintiffs,**                 :

                                    :       **(Magistrate Judge Carlson)**

**v.**                        :

                                    :

**CITY OF SCRANTON, et al.**      :

                                    :

**Defendants.**            :

## ORDER

In accordance with the accompanying Memorandum Opinion, the defendants' motion to consolidate (Doc. 7) is GRANTED, in part, solely for purposes of global settlement discussions, and purposes the parties in this lawsuit will report to us by January 31, 2020 whether they are willing to engage in settlement negotiations. As for further consolidation of these actions, we will DEFER any decision on this issue pending the outcome of this mediation.

The defendants' motion to dismiss (Doc. 7) is GRANTED, in part, and DENIED, in part, as follows: As to Count I the motion is GRANTED, in part, to remove the claims against Defendants Courtright and Uher as to the William Street property, Defendants Courtright and Carmona as to the Willow Street property, and

Defendant Courtright as to the Philo Street property. Count I is DENIED, in part, as to the remainder of the plaintiffs' claims.

Count II is DENIED.

Count III is DENIED.

Count IV is GRANTED.

Count V is GRANTED, in part, to remove the claims against Defendants Uher and Courtright as to the William Street property, Defendants Carmona, Uher, and Courtright as to the School Street property, and Defendants Carmona and Courtright as to the Willow Street property, as well as any factually undeveloped claims regarding surveillance by Defendant Carmona. Count V is DENIED, in part, as to the remainder of the plaintiffs' claims.

Count VI is DENIED.

Count VII is GRANTED.

Count VIII is GRANTED, in part, as to Defendant Courtright, and DENIED, in part, as to the remainder of Count VIII.

The defendants' motion to dismiss the punitive damage claims is GRANTED as to the City of Scranton and the defendants in their official capacities and DENIED as to the defendants in their individual capacities.

Further to the extent that this motion to dismiss is granted it is granted without prejudice to the plaintiffs attempting to amend their complaint to state a claim upon

which relief may be granted by including proper allegations against appropriate party-defendants that meet the requirements of federal law, provided that the plaintiffs acts within 21 days of the entry of any dismissal order.

So ordered this 17th day of December 2019.

_S/Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge